Case No. 22-1262, et al., Longmont United Hospital Petitioner v. National Labor Relations Board. Mr. Scully for the petitioner, Mr. Colton-Batt for the respondent. Mr. Scully, good morning. Good morning. May it please the Court, my name is Patrick Scully and I am joined by John Melkin this morning and we represent Longmont United Hospital. Your Honors, employees and employers rely on the integrity of the National Labor Relations Board election process as it has been an element of labor law that has mostly escaped the political vacillations that usually accompany a change in administration. Right-line rules ensure security in that election process and may have been historically applied without regard to the identity of the voter or the outcome of the election, except in this case. The Board has improperly adopted Member Stephens' dissent in Thompson-Roofing and thereby invited post-hoc litigation on the issue of whether a voter has put her signature on the envelope of a mail ballot. The mischief of this departure is that, and it is a departure from established precedent without reasoned explanation in our view, is that parties are thereby invited into a process whereby they will litigate the subjective intent of the voter in a way that is contrary to not only established precedent of the NLRB but of this Court. Is it litigating subjective intent or it's just litigating the fact question whether the voter signed the envelope? Your Honor, we believe that it's not a fact question but a legal question in that the Board, since Thompson-Roofing, has held that the mail ballot voter must put her signature on the ballot and has rejected. Okay. So then the question is, did the voter – is this Ms. Schalleman's signature? No. Is this her signature? Your Honor, the question is how that issue is determined. And by the use of exemplars, as we noted in our brief, there are 16 exact exemplars of her signature. And our position is that the decision should have been made based on that without post-hoc litigation having the voter, for instance, verify that this is indeed my signature. And that would seem to be the best evidence of whether or not she signed the envelope. It's her testimony that she did or didn't. Well, that testimony, Your Honor, occurred after Ms. Schalleman also testified that she had conferred with the petitioner, the petitioning union in this case, and had been advised that her vote would in fact determine the outcome of the election. And whether or not that's true, that demonstrates the mischief of litigating this. The point is, historically, the voters simply looked to exemplars of signatures and declared as void if the ballot was not signed. And without regard to how we define printed, in this case, Ms. Schalleman, in fact, wrote her name in the way she had printed it on the exemplars that we've provided in the course of the investigation and also cited in our brief. I'm trying to understand your position, Counsel, but you seem to be saying that if there's a disputed factual issue, there shouldn't be a hearing to determine the fact. And that's unusual in my view. Your Honor, our position is that it's a legal issue whether or not it was the signature. I don't think that there's any dispute in the record here, as acknowledged by the hearing officer and the regional director, that the writing on the ballot envelope in this case does not resemble Ms. Schalleman's signature. But I think the disputed factual issue was whether that was her signature, and she ended up testifying that she signs things fast sometimes, and she has a different signature when she's taking her time. And that doesn't seem incredible to me. I'm just having trouble understanding. You just think the entire process of having a hearing is incorrect. You want us to hold that we shouldn't have hearings to determine factual issues. No, Your Honor, what we're contending is that the board determined this factual issue when the hearing officer and the regional director said that the signature on the ballot envelope did not resemble this individual signature. But if it doesn't resemble, it doesn't mean that it wasn't her signature. Well, I think it's fairly clear on the record that it wasn't, because it doesn't match the prior exemplars. And I think that a hearing can occur. But there could be an explanation for that. And you're saying we shouldn't be allowed to seek an explanation. No, all we're suggesting is that the parties, when there's a highly contested election, and there's a slim margin, as there is in this case, that certainly the parties, whether or not we agree in this case that all of what was introduced was truth or not, it demonstrates the mischief of litigating it after the fact. But if the board had ruled against you, you would have wanted a hearing to prove your side of it? Actually, most of these cases are the Starbucks case, and certainly Thompson-Rubin involved contentions by employers saying that this individual's ballot should be counted and they shouldn't be disenfranchised when there wasn't a signature, when there was no dispute about the person validly submitting the ballot. Well, I guess my point is just it could go either way, and whoever is on the wrong side of that should be allowed to have a hearing to make sure that this was correct. Well, Your Honor, we agree it could go both ways, and I think that that's the importance of having a bright line rule. And that's why the board recently in the dual-mark ballot cases in Providence Portland Medical Center spoke of the fact of having a bright line rule to simply void any sort of dual markings, rather than litigate the subjective intent of the marker of that, which led to results in those cases over years upon years where the board was litigating whether or not an individual tended to make a smudge or a line or an X in a ballot. And I think that that demonstrates really what the issue is in this case, that we have exemplars. They certainly, it's a distinctive mark. The board recognized that. And then after the fact, there was a hearing in which one of the interested parties spoke to the individual, cut them, and had that person post hoc verify a signature that did not look anything like any of the other signatures that were in the record. And I think that that's why ballots get voided, is so that there isn't this constant litigation of what the purpose was in making a particular mark. Suppose you have exemplars, and then there's a signature, and it's a nice, distinctive, elaborate signature, and then there's something much less distinctive, messy, and the voter wants to make a proffer that she had a stroke, which has affected her motor skills. And, you know, make a further proffer that here's the video recording showing her doing her best to sign. I think she couldn't do that. Well, in that case, your honor, all we're contending is that post hoc litigation is inappropriate. So anything up to the point, our point is, is that the moment that the mark is made, that it should be a signature and the board has repeatedly held that if it's printed in any way that it is void. So in that case, your honor, an individual will would have had the medical condition prior to marking the ballot. And there wouldn't be sort of this after the fact. Right. But if you just compared signature to the exemplar, it would look totally different. Yes, but there would be evidence part of the time that the person cast their ballot, which I think is the critical time for all purposes in voting at the NLRB. So you're saying there could be a hearing, but they can't admit any evidence after the marking of the ballot. We're suggesting, your honor, that, of course, there could be a hearing. But to verify the exemplar, to verify that it was the signature at the time that it was signed. In this case, we had a post hoc photograph of the state that purported to verify the writing on the ballot, which looked quite similar to the printed. Didn't they admit other signatures by Ms. Salomon from before signing of the ballot that also didn't look like the ones that you admitted? None of which were claimed to be her signature. They were insignia on two different documents, which were one of them was admitted not to be her signature by the witness. And also another that did not resemble the writing on the mail ballot envelope. Mr. Scully, can I ask you, would you have been satisfied if instead of being asked boldly, is this your signature, which is the whole issue in the case? And she said yes. If she'd been asked, did you make the entry on that ballot? I'm afraid I would not, your honor, because that that is really the point of Thompson Rubin, which the board has disregarded. Is that the identity that is a fact as opposed to what she intended? As either a signature or printing, it is a fact that she was the voter and we did not test that for the purposes of this appeal. But that was the case in Thompson Rubin as well. And many cases decided by the board that the voter, in fact, passed the ballot, but it was not signed. Therefore, it was avoided. So she couldn't even be asked. In your interpretation of the rule. Did you put that mark on the ballot? I think that certainly the witness to be asked that, but we don't believe it should be determinative that really the question is not the identity of the voter or whether or not they voted, but whether it was signed. And again, I believe that the board is arguing about that very issue that really the key issue is, did this person cast the ballot? And we're saying that that may be a rationale, but the rule has to be a bright line rule in order to avoid this process effectively that we're in. And I would have to accept the other side of that issue, your honor. If, in fact, the board had said, well, this is a signature based on the exemplars up to this point. You're not contesting that Michelle made the marking that I'm looking at here in a yellow box. That's correct. And you're saying there's a distinct legal question about whether that marking is sufficiently in cursive to count as a signature. Well, there's a distinct legal question as to whether or not that was signature. And the legal question is really why the board departed from its established precedent in Thompson roofing without reason explanation. Again, the board could revisit this issue and explain why that it is no longer going to apply a hard and fast roll with respect to ensure they didn't do that in this case. And that is that is why we brought this petition. All right. We'll give you a minute reply. Thank you. Mr. Good morning and may it please the court. Mark Colton back to the National Labor Relations Board. The board requests that its order against on my United Hospital be enforced in full. I'd like to begin by talking about the challenge to nurse Solomon's ballot. Longmont challenged the ballot at the vote count on the basis that it did not match signature samples in long months possession. The question is whether the board abused its discretion and overruling the challenge and it did not. The board found and Longmont does dispute that nurse Solomon did cast this ballot. So, any concerns about impersonation or fraud were resolved. Any concerns that might have been raised by the mismatching. Under board law, this is this is dispositive. This alone is dispositive. But Longmont argues that the board still should have disenfranchised nurse Solomon. If she did not sign it in some kind of formalistic or technical sense of the term. Long months wrong on the law, but it doesn't make a difference in this case. Nurse Solomon credibly testified that she did sign the envelope. So, even accepting for argument's sake that there is some kind of technical signature requirement, it's met here. Why do you keep saying technical and insignificant? The whole point of having a signature rather than a printed name is so that everyone knows that voter. It's just like when we vote an election, we have to go back in the day when we had paper ballots. We couldn't print our name. We had to sign our name. When we register, we have to sign. Yes. Yes. No, I don't mean the general requirement is is is technical or insignificant. It is very important that the board has had at least since the 1940s and probably for its entire practice. The point is the purpose of the requirement is to preserve election integrity. OK, so the board requires the signature on the ballot envelope and mail ballot specifically. So that this comparison can happen. And in this case, the system worked, right? The. There was a signature non printed signature on the ballot. At the ballot count, it was presented to the parties. The employer noticed something potentially concerning. In the form of a miss and they had a sample in their personnel file that didn't match. So, the board allowed the challenge to go forward and conducted a hearing to make sure. That the integrity of the election wasn't compromised. So, this is the system working, but my only point is. It is undisputed that the integrity of the election was not. Yet the company wants to create this. Distinction between a non printed cursive name. And some kind of nebulous technical thing that is a signature. That is different from a cursive name. That's what I mean when I, when I use the word. Well, I apologize gave the impression that the board doesn't consider this. General requirement very important does. Well, I don't I agree with you in this case, because there's no question. As to her identity, she was miss so and so. And she cast that ballot, but the issue is whether she signed it or printed. Respectfully, your honor, I disagree. You don't disagree. Well, what do you disagree with? I disagree that that is the issue in the reply brief. We weren't frankly, we were a little bit puzzled by what long is asserting in the reply brief. They make clear that their position is not this was a printed name. Their position is that it was not a signature. There's, there's, if you see the distinction, it's where in, according to Longman's argument, we're not in a binary world. It can be non printed, but also not a signature. If they were arguing, it's a printed name, which they, they clarified in their reply brief. They are not. That would be a different, a different issue. I think it would be resolved by simply looking at the base of the envelope. The board, when the board talks about printed names, it uses the ordinary. It means that in the ordinary sense, it basically says, if you have printed lettering, that doesn't create the security measure that I just alluded to. It's not distinctive enough to to to satisfy. Sorry, I'm not sure what class of cases we're talking about. If you assume that this, this is Miss Solomon who made the marking. And you also assume that we're not dealing with something that is too printed. What are we talking about? What's what's the thing that could not be her signature? I think it's a great question. Your honor. We don't. We don't know. I'm not sure. Yeah. Longman's position is that there is some third category. So, I just, this is kind of related to this line of questioning. I just wanted to briefly talk about Thompson roofing. And explain the holding of that case, the point of Thompson roofing. That is the board affirming a preexisting practice of voiding mail ballot envelopes that come in that have undisputed printed lettering in them. That is the point of Thompson roofing. That the practice existed, it was in the case handling manual. The question came up, whether the board would endorse that and Thompson roofing. It did. Saying that basically printed printed lettering isn't isn't useful to. Ensuring us that of the integrity of the election. Again, we, everyone agrees we're not in that. I believe everyone agrees. We're not in that situation here. And I would, I would argue that looking at the ballot envelope makes clear that we're not in that situation. This is not a printed name. So, what we have is in this case, a non printed name written on a ballot envelope. And one party saying, this, this doesn't match a sample. There's a concern that maybe some, there was some funny business here. That brings us into the world of the college case. Which is the recent patient 2021 and addressing very similar facts. In that situation where that concern is right. If the balloting question ends up being potentially dispositive of the election, the board can talk to hearing to see. Is there anything to this concern? Is there anything to this suspicion? And in this case, that's exactly what they did. And they, and they found that there wasn't, it turns out that there wasn't any impersonation or fraud and no one disputes that here. I also wanted to briefly touch on a. And I'll know, by the way, that that long month is ignores college found in its. Even though it is the case most on point here. I wanted to briefly respond to something that was said in the reply brief and that was again said here, which is. I think somewhat, somewhat of a mischaracterization of the documentary evidence in this case. There is a lot repeatedly says that there are these 16 signature exemplars and. They don't look like the ballot envelope and not, and they basically say there's nothing else that is not true. The driver's license, the nurse in question there, Solomon's driver's license was produced. Actually, by long line pursuant to a subpoena introduced by the union in the representation proceeding. That driver's license establishes two key facts. First, it does not resemble the signature exemplars that long months sites. And so that at the very least establishes that this nurse has more than one version of the various. But the regional director in a footnote found and reasonably found that if you actually look at that driver's license, the style is very similar to the one on the ballot below. So beyond establishing multiple versions, it also shows that. Robert's testimony that, hey, I wrote this. This is this is how I signed my name when I'm not in a hurry. The significance of that is that it corroborates Mrs. Solomon's testimony and supports the board's determination to credit her about the Social Security card. Didn't didn't she testify that she didn't write that? So her testimony with regard to the Social Security card, which I'll note long mentions the Social Security and its reply brief for the first time. It didn't mention it in its opening brief. So I think we would argue that it's waived. We didn't get a chance to respond, but her testimony on the Social Security card is very unclear and confusing. The regional director analyzes it in a, I think, in a footnote in the regional director's decision, which the board affirmed. She doesn't clearly she does say it's not her signature, but she doesn't really explain. I think the regional director basically found that the testimony wasn't enough to overturn the hearing officer's credibility resolution of her, particularly given given the corroborating testimony regarding her driver's license and also the fact that the hearing officer got to watch her testify and observe her demeanor. Our position would be any concerns raised by this Social Security card testimony wouldn't be enough to this court, certainly to reach into the representation proceeding and reverse that credibility determination, given the extraordinary deference the court gives to those those kinds of determinants. I see I'm over time. The board requests enforcement of its order in full. I thank you very much. Thank you. Thank you. Mr. Scully, why don't you take two minutes? And why don't you begin by saying or by answering his comment that you changed your position in the reply brief with respect to the third? It's not a print. It's not it's not printed. It's not signed. What is it? Your Honor, happy to do that. What we contended in the reply is simply that to be printed. It doesn't have to appear as block lettering, which is the position that the agency took in the 16, not one exemplar, but 16 exemplars. Most of them included a space from the Shaman to print her name. And we submit that the printing on those is much like the writing on the ballot envelope. So we merely explain that we're not saying that printed means block lettering. It's clearly not block lettering, but it is how the Shaman had previously printed her name with respect to the. So sorry. So your position is that the ballot that is before us is printed. Correct, Your Honor. So in your favor, we'd have to find it printed that it's not signed. I believe, Your Honor, under the board precedent. And I just wanted to. So are there only two possibilities signed or printed or is there a third possibility? I think that the only rule that the board has promulgated is that there must be signed. It did not. It's never said that the the objecting party or the challenging party has to prove that it was printed. The board has only said, OK, so if we look at this. Marking and we think it's a signature you lose. Well, I think that the hearing officer in the R.D. said that it didn't resemble these exemplars. So I don't think that that's the proper inclusion. I think the issue in this case is what is the rule of law at the board? And I think that I'm confused, though, because if it's a signature and Michelle Aman did it, isn't that a good ballot? But I think, yes, indeed, Your Honor, but I believe that the record demonstrates that it was not her signature. And I think that the exemplars demonstrate that. And I just want to, if I may. But then we're back to is there a third category? Because if it's a signature and it's hers, it seems to be a good ballot. It's not block printing. So is there some third category you think this is? Well, I think that there is in the way that Michelle Aman printed her name in the exemplars, Your Honor. And in those there is cursive lettering where she printed her name. And so I think in this particular case, the manner in which you printed her name looked exactly like what appeared on the mail ballot envelope. And if I may just have a minute, Your Honor, with respect to college bound Dorchester, which counsel addressed that did not overturn Thompson roofing. And it's not inconsistent with Thompson. I mean, it's not inconsistent with Thompson. It did not. It did not overturn it. And it's not. And I think that in all of those cases where the board had voided ballots for non-signature, the parties always had argued in most cases the petitioner had argued that the ballot was cast by an eligible voter so that there's no there's no fraud. But the board nonetheless voted the ballot. And so with that, we'd ask that this order be vacated. And for all the reasons stated in our brief. Thank you. All right. Thank you. Thank you.
judges: Henderson, Katsas, Pan